UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| In re: | Chapter 13 |
| | Case No. 10-45856-MSH |
| JOHN R SARNO AND | |
| MAUREEN A SARNO | |
| Debtors | |

**MEMORANDUM OF DECISION ON WEBSTER FIRST FEDERAL CREDIT UNION'S OBJECTION TO CONFIRMATION OF PLAN AND DEBTORS' MOTION TO AMEND SCHEDULE A**

The debtors, John and Maureen Sarno, and their second mortgage lender, Webster First Federal Credit Union ("WFCU"), are embroiled in a dispute over the value of the debtors' home in Auburn, Massachusetts and whether WFCU's mortgage on the home may be stripped off. The debtors propose in their chapter 13 plan to do just that and to treat WFCU's claim of approximately $65,000 as a general unsecured claim. In an apparently related gambit, the debtors filed a motion seeking leave to amend schedule A to their bankruptcy petition, which lists real estate owned, to reduce the stated value of their home from $339,000 to $335,000. WFCU opposes both confirmation of the plan and allowance of the motion to amend. As both matters involve the value of the debtors' home, they were consolidated and an evidentiary hearing on both took place on September 14, 2011.

The reason the value of the debtors' home is such a critical issue is because under Bankruptcy Code § 1322(b)(2), as interpreted by a number of courts including the Bankruptcy Appellate Panel for the First Circuit in *In re Mann*, 249 B.R. 831 (1st Cir. BAP 2000), a claim secured by a debtor's principal residence may be modified only if the claim is completely

1

"underwater," that is, the value of the residence is no greater than the amount of liens on the residence senior to the lien of the creditor whose claim is being modified. A debtor's ability to invoke § 1322(b)(2) to modify a mortgage solely on his principal residence depends on the mortgage being entirely unsupported by collateral value. If the value of the home exceeds the amount of senior liens by even one dollar so that the claim of the lender in question is supported by one dollar of collateral value, a chapter 13 debtor may not modify the claim at all and must treat it as if it is fully secured. *See Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 330-31 (1993).[1]

At the hearing the debtors introduced evidence of their home's value consisting of an appraisal along with the testimony of the appraiser, Douglas Pulsifer, which concluded that as of June 9, 2011, more than six months after the November 27, 2010 bankruptcy petition date, their home was worth $315,000. WFCU introduced its own appraisal along with the testimony of the appraiser, Robert Cote, Jr., that as of December 17, 2010 the home was worth $350,000. WFCU also introduced into evidence a comparative market analysis dated May 15, 2010 prepared for the debtors by Ron Ouelette of Remax Advantage 1 setting forth a "market value range" for the debtors' home of between $335,000 and $345,000 with an opinion that the home's "final

---

[1] While the statute as explicated by the Supreme Court in *Nobelman* is clear enough, its wisdom is not. The inability of consumer debtors in chapter 13 or chapter 11 to restructure their home mortgage debt by modifying partially unsecured mortgages in the same way that corporate debtors routinely restructure their secured debts has greatly exacerbated the duration and severity of the current economic downturn. *See, e.g.*, Adam J. Levitin, *Resolving the Foreclosure Crisis: Modification of Mortgages in Bankruptcy*, 2009 WIS. L. REV. 565, 571-77 (discussing why the "bankruptcy system . . . is incapable of handling the current home-foreclosure crisis because of the special protection it gives to most residential-mortgage claims."). To date, all efforts to obtain Congressional approval of amendments to §§ 1322(b)(2) and 1123(b)(5) to level the playing field for consumer and business debtors have been unsuccessful. The most recent proposed amendment, included in the Home Foreclosure Reduction Act of 2011, awaits action by the House Subcommittee on Courts, Commercial and Administrative Law. *See* Home Foreclosure Reduction Act of 2011, H.R. 1587, 112th Cong. § 5 (2011).

2

value/sale price" was $339,000.

In response to WFCU's objection to their chapter 13 plan, the debtors acknowledged that they relied on the Remax market analysis in placing a value on their home as of the November 27, 2010 petition date, originally listing their home on schedule A to their petition as having a value of $339,000 and subsequently moving to amend schedule A to reduce the value to $335,000.[2] The debtors derived both values from the Remax market analysis, $339,000 being the "final value/sale price" and $335,000 being the low end of the "market value range." The debtors insist, however, that the value of their home on the bankruptcy petition date is not relevant to evaluating a § 1322(b)(2) lien stripping provision in a chapter 13 plan. The debtors assert that value at or near the time of plan confirmation is the proper benchmark and urge reliance on the June 9, 2011 Pulsifer appraisal of $315,000. WFCU advocates the petition date or shortly thereafter as the appropriate temporal perspective for valuation, proffering the December 17, 2010 Cote appraisal of $350,000 as the best evidence of value.

But value is only one side of the § 1322(b)(2) coin. *See In re Abdelgadir*, 455 B.R. 896, 901-02 (9th Cir. BAP 2011) (discussing the two-step decision process in determining whether a creditor's claim may be modified). To determine whether a mortgage claim is out of the money it is necessary to know the amount of the senior debt on the collateral. The parties stipulated that the principal balance due to Bank of America ("BofA"), holder of the first mortgage on their home, on September 1, 2011 was $326,156.31. The undisputed evidence presented established that as of December 13, 2010 the principal balance due by the debtors to BofA was $333,599.40 and that

---

[2] The debtors' motion to amend schedule A to their bankruptcy petition (Docket No. 32) was followed by an amended motion to amend schedule A (Docket No. 39). Both motions are identical as to the issues under consideration here.

3

after a monthly payment to BofA of $2076.94 on or about January 1, 2011 the principal balance due dropped by $703.44 to $332,895.67. From these facts as well as from the fact that the debtors' chapter 13 plan reflects no pre-petition arrearage to BofA, I deduce that as of November 27, 2010, the date of the commencement of this case, the principal balance due BofA was approximately $700 greater than it was on December 13, 2010. Therefore, I find that the principal balance of the first mortgage loan on the debtors' home as of the bankruptcy petition date was no greater than $334,500.

Armed with the requisite numbers, all that remains is to determine the appropriate vantage point from which to apply them. There is no binding precedent in the First Circuit and courts are generally in disagreement as to whether the point of reference is the petition date as advocated by WFCU or the plan confirmation date as urged by the debtors.[3]

It is generally acknowledged that the Bankruptcy Code mandates a flexible approach to valuation based on the purpose of the valuation and the proposed disposition or use of the property being valued. *See In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 73-74 (1st Cir. 1995) (citing Bankruptcy Code § 506(a)'s express directive on flexible valuation). So, for example, in determining lack of equity under Bankruptcy Code § 362(d)(2)(A), liquidation value might be the

---

[3] *Compare In re Valls*, 2010 WL 2745951, at *1 (finding that where the debtor seeks to keep his home, the petition date is the relevant valuation date); *In re Young*, 390 B.R. 480, 488 (Bankr. D.Me. 2008) (finding the petition date to be the appropriate date time for valuing the real property because "[t]he estate's interest in property . . . is established upon the commencement of the bankruptcy case."); *In re Dean*, 319 B.R. 474, 478 (finding the petition date to be the appropriate date to value the debtors' principal residence), *with In re Reese*, 428 B.R. 508, 510 (Bankr. E.D. Mo. 2010) (holding that vehicles should be valued as of the date of confirmation when determining the amount owed under a chapter 13 plan); *Crain v. PSB Lending Corp. (In re Crain)*, 243 B.R. 75, 82, 85 (Bankr. C.D. Cal. 1999) (holding the proper valuation date is ten days after plan confirmation); *In re Kennedy*, 177 B.R. 967, 973-74 (Bankr. S.D. Ala. 1995) (finding that the value of the debtor's car should be determined as of the confirmation hearing).

4

appropriate standard in a chapter 7 case while in a chapter 11 case fair market value might be the better measure.

In this case, the purpose for the valuation of the debtors' home is in order to determine the treatment of WFCU's claim in the debtors' plan. Also, an integral part of any such determination is establishing the amount of senior claims, here the first mortgage claim of BofA. The bankruptcy petition date is the only reasonable reference point for establishing claims in bankruptcy and, therefore, like the Ninth Circuit Bankruptcy Appellate Panel in *In re Abdelgadir*, 455 B.R. 896 (9th Cir. BAP 2011), [4] I find that the proper date for determining the value of the debtors' home and whether WFCU's claim is secured by that home is the petition date of November 27, 2010.

I have found that on the petition date BofA was owed no more than $334,500 on its first mortgage loan. Thus to obtain confirmation of their chapter 13 plan the debtors had the burden to prove that on the petition date their home was worth no more than $334,500. They have not carried their burden. The Pulsifer appraisal of $315,000 introduced by the debtors provides evidence of value in June 2011 and is not probative of value as of the petition date. WFCU's appraisal of $350,000 dated three weeks after the petition date would at the very least rebut any argument by the debtors that the Pulsifer appraisal should be considered relevant to their home's

---

[4] The court in *In re Abdelgadir* concluded:

> [A] creditor's right to payment, whether it later is deemed secured or unsecured depending on the value of the collateral, is fixed as of the petition date. Therefore, our statutory analysis leads us to conclude that the determinative date for whether a claim is secured by a debtor's principal residence is, like all claims, fixed at the petition date.

455 B.R. 896, 903 (9th Cir. BAP 2011).

value some six months prior to the appraisal date.   Further undercutting the relevance of the Pulsifer appraisal is the debtors' own schedule A to their bankruptcy petition where both the original schedule A and the proposed amended schedule A value the home at more than the first mortgage debt to BofA.   Whether on the petition date the debtors' home was worth $350,000 as asserted by WFCU or $335,000 as proposed by the debtors in their amended schedule A, WFCU's claim is immune from modification under Bankruptcy Code § 1322(b)(2).

In their response to WFCU's objection to confirmation of their chapter 13 plan, the debtors raise two additional arguments in favor of treating WFCU's claim as wholly unsecured.

The first is procedural.   The debtors maintain that WFCU's objection to confirmation was untimely and thus should not be considered.   Appendix 1, § 13-8(a) of the Massachusetts Local Bankruptcy Rules requires that unless the court orders otherwise objections to confirmation of a chapter 13 plan shall be filed by the later of thirty days after the first date set for the § 341 meeting or thirty days after service of a modified plan.   As no modified plan was filed in this case, the deadline for objections to confirmation of the debtors' plan under the local rule was February 6, 2011.   WFCU's objection was not filed until March 24, 2011.

While WFCU's objection was technically untimely the local rule affords the court discretion to order otherwise.   There has been no allegation that between February 6 and March 24, 2011 anything whatsoever occurred in this case which would make WFCU's objection prejudicial or unfair.   Furthermore, even had WFCU not objected to its treatment under the plan, the bankruptcy court has an independent responsibility under Bankruptcy Code § 1325(a) to determine that the plan complies with the provisions of chapter 13 and the Bankruptcy Code. Under these circumstances I decline to disable WFCU from asserting its objection to the debtors'

6

plan.

      The final argument offered by the debtors as to why WFCU should be deprived of a claim secured by their home is based on WFCU's issuing an Internal Revenue Service form 1099-C in connection with the debtors' loan after the petition date.   A form 1099-C is a return which a creditor must file with the IRS notifying the IRS of the cancellation of a debt.   Sometime after the debtors filed their bankruptcy petition, WFCU filed a form 1099-C with respect to the debtors' loan notifying the IRS of the bankruptcy and of the cancellation of $64,961.65 of debt.   The debtors assert that this filing estops WFCU from objecting to their plan.   The debtors fail to elaborate on the nature of the estoppel to which they refer.   In their response to WFCU's objection to their plan they suggest that the filing of the form 1099-C created "potential income tax consequences" to them (presumably cancellation of debt income).   This would imply an equitable estoppel argument.   In their supporting brief, however, the debtors seem to focus more on the direct consequences of the form 1099-C, namely that the document itself effectuated the forgiveness of their mortgage debt.   Either way, the debtors' argument fails.

      The requirements for the issuance of forms 1099-C are set forth in § 6050P of the Internal Revenue Code (26 U.S.C. § 6050P) and 26 CFR 1.6050P-1.   The latter provides:

> Except as provided in paragraph (d) of this section, any applicable entity (as defined in section 6050P(c)(1)) that discharges an indebtedness of any person (within the meaning of section 7701(a)(1)) of at least $600 during a calendar year must file an information return on Form 1099-C with the Internal Revenue Service. Solely for purposes of the reporting requirements of section 6050P and this section, a discharge of indebtedness is deemed to have occurred, except as provided in paragraph (b)(3) of this section, if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date on which the identifiable event has occurred.

It is apparent from this regulation that a form 1099-C is "informational" and that it must be filed

"whether or not an actual discharge of indebtedness has occurred." In construing this regulation the IRS has stated that it does not view a form 1099-C as an admission by the creditor that it has discharged the debt and can no longer pursue collection thereof. *Zilka v. Bayer Emp. Fed. Credit Union (In re Zilka)*, 407 B.R. 684, 688-89 (Bankr. W.D. Pa. 2009). In *Owens v. Commissioner*, 67 Fed.Appx 253, 2003 WL 21196200 (5th Cir. 2003), the U.S. Court of Appeals for the Fifth Circuit observed that a form 1099-C evidences an intention to cancel "not, we must point out, actual cancellation of the loan." *Id.* at *3; *see also In re Zilka*, 407 B.R. at 670.

While a creditor's filing of a form 1099-C does not in and of itself cancel the underlying indebtedness, it may nevertheless be deemed to effect cancellation if it is determined to be an "intentional voluntary act" of discharge within the meaning of § 3-604(a) of the Uniform Commercial Code, codified in Massachusetts as Mass. Gen. Laws ch. 106, § 3-604(a). *See Amtrust Bank v. Fossett*, 224 P.3d 935, 936-37 (Ariz. Ct. App. 2009) (interpreting Arizona's identical UCC provision). Section 3-604(a) provides:

> A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument, cancellation or striking out of the party's signature, or the addition of words to the instrument indicating discharge, or (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed writing.

The Massachusetts Appeals Court has held that the mistaken cancellation of a note is not an effective discharge under § 3-604. *Nationsbanc Mtg. Corp. v. Eisenhauer*, 733 N.E.2d 557, 562 (Mass. App. Ct. 2000). Here, the unrebutted evidence establishes that WFCU's issuance of the form 1099-C was a mistake. Subsequent to the issuance, WFCU filed a corrected form 1099-C changing the amount of debt cancelled from $64,961.55 to $0. And since WFCU's corrected 1099-C effectively neutralized any negative tax consequences to the debtors created by the

8

original,[5] the debtors did not suffer any material detriment as a result of WFCU's conduct. Material detriment is one of the hallmarks of a claim of equitable estoppel. *See* Howard J. Alperin, 14A *Mass. Practice* § 9.49.

As to the debtors' motion to amend schedule A to their bankruptcy petition, the debtors have admitted that they relied on the Remax market analysis in placing a value on their home as of the petition date. As indicated previously, the Remax analysis establishes $339,000 as the "final value/sale price" of the home which is the value ascribed to it by the debtors in their original schedule A. In seeking to amend schedule A to reduce the value to $335,000 the debtors are taking the lowest end of the "market value range" indicated in the Remax analysis. There is no reasonable or rational basis for this choice. The motion to amend appears to be nothing more than a post-facto attempt to value the home at less than the BofA loan balance, and a clumsy attempt at that given that the BofA loan balance on the petition date was $334,500.

Based on the foregoing, I will deny the debtors' motion to amend schedule A to their bankruptcy petition and sustain WFCU's objection to their plan. The debtors shall file an amended plan within forty-five days. Separate orders shall issue.

Dated: December 20, 2011

By the Court,

*/s/ Melvin S. Hoffman*
Melvin S. Hoffman
U.S. Bankruptcy Judge

---

[5] It is doubtful that the debtors could have suffered any negative tax consequences as a result of WFCU issuing a form 1099-C. Although the general rule is that discharge of indebtedness results in gross income to the borrower, 26 U.S.C. § 108(a)(1) provides that when the discharge occurs "in a title 11 case" or "when the taxpayer is insolvent," then the borrower is not required to recognize gross income as a result of the lender's discharging the debt. *See In re Crosby*, 261 B.R. 470, 474 (Bankr. D. Kan. 2001).

9